IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAM MORGAN,

    Plaintiff,

v.

CITY OF PLEASANT HILL, et al.,

    Defendants.
_____/

No. C 04-04865 CRB

**MEMORANDUM AND ORDER**

This section 1983 action arises out of the defendant police officers' 10 minute detention of plaintiff Sam Morgan, a California Highway Patrol Officer. Plaintiff alleges that there was no probable cause to detain him; the officers used excessive force; the detention was racially motivated; and the City of Pleasant Hill had a policy that led to these constitutional violations. Now pending before the Court is defendants' motion for summary judgment on all claims. After carefully considering the evidence and argument submitted by the parties, and having had the benefit of oral argument, defendants' motion is GRANTED in part and DENIED in part.

**FACTUAL HISTORY**

At approximately 8:30 p.m. on December 19, 2003, a man called the Pleasant Hill police dispatcher. The caller reported that he had been in Einstein Entertainment in Pleasant Hill when two gentlemen came into the store. He reported further that the store employees

then suddenly announced that the store was closing and that all the customers should leave, as there was an emergency. The caller left the store and a few minutes later drove by the store. He reported that when he drove by he saw the guys who had entered the store behind the register, and they had a phone up to their ear. The caller explained that the store was supposed to be open until 10:00 p.m. He told the dispatcher: "I don't know it just felt funny, and I wasn't really sure if I should call, I mean, but it just was really weird." The caller then described the two men: a 6'3" African-American man, and a shorter, dark-skinned Asian man. He reported that the men had a big case with them, "like one of those large suitcases."

    The dispatcher called Pleasant Hill police officer defendant Drew Sanchez and his partner. The dispatcher ordered the officers to respond to the store and stated that a caller reported that "two subjects came into the store, spoke to the employees, the employees then told all the customers they needed to leave that they had an emergency, and locked the doors behind them." Defendant police officer Steve Dexheimer also responded to the call. The dispatcher described the subjects as a tall black male and a shorter Asian male carrying a large suitcase.

    The responding officers asked the dispatcher to call the video store. She did, and a person identifying himself as "Joseph" answered the phone. The dispatcher relayed to Joseph what the caller had reported and said, "he was a little concerned for your guys' safety. . . . So we wanted to call and make sure." Joseph responded, "the subjects are still here." He explained further that the two men had police identification, but no uniforms, that they came with state papers, and that it looks like official business. The dispatcher then asked Joseph to send someone outside to talk with the officers. The dispatcher reported to the defendant officers that the store employee had said "that the subjects that are there, still there. And that they are not uniforms, but have badges, and state papers, and say that they're police officers."

    Joseph came out of the store and talked to the defendant officers. He reported that the men were taking money out of the register. Officer Dexheimer then reported to the dispatcher about the money being taken from the register, and explained that the officers still

2

did not know what was going on. Officer Dexheimer asked the dispatcher to place another call to the store. He also asked the dispatcher to send another officer to cover the rear of the store. A store employee, "Bill," answered the dispatcher's call to the store. The dispatcher told Bill to meet the officers outside and to bring the phone with him. He did so. Neither Joseph nor Bill could tell the officers anything more about why the men were taking money out of the register.

According to the defendant officers, they believed a night-time robbery was in progress so they entered the store with their weapons drawn. Before they did so, they radioed the dispatcher that they were "code 4." Code 4 means no further assistance required. At that time there were two other officers on the scene. The defendant officers then entered the store with their weapons targeted at the two "suspects." According to plaintiff, he and his partner identified themselves as police officers, but defendants ordered them to the ground and handcuffed them. Officer Dexheimer saw a badge around plaintiff's neck.

The two men identified themselves as plainclothes California Highway Patrol ("CHP") investigators who were in the process of serving a tax warrant at the business. The defendant officers searched plaintiff and his partner and removed their weapons and identification, while they were still handcuffed and on the ground. Officer Dexheimer then asked his partner to search plaintiff again, "to make sure I didn't miss anything." The two "suspects" provided law enforcement identification, badges and other corroborating identification showing that they were CHP Officers Sam Morgan and Edward Dela Cruz. The defendant officers then removed the handcuffs, released them, and apologized.

Plaintiff asked the defendant officers why they responded as they had. Officer Dexheimer responded something to the effect that "this is Pleasant Hill, this town is lily white . . . you guys are two minorities . . . what do you expect us to do?"

According to plaintiff, the detention lasted approximately 10 minutes. The evidence also demonstrates that the CHP has a policy that requires tax warrants to be served by uniformed officers, although plaintiff claims that he was given permission to serve this particular warrant in plainclothes.

3

**PROCEDURAL HISTORY**

CHP Officer Morgan filed this section 1983 suit seeking damages and injunctive relief. He claims he was detained without probable cause; defendants used excessive force; they detained him because of his race; and a City of Pleasant Hill policy led to the violations (Monell claim). Defendants move for summary judgment on all claims on the ground that no reasonable trier of fact could find any constitutional violations. In the alternative, they argue that at a minimum they are entitled to qualified immunity.

**LEGAL STANDARDS**

**A.    Summary judgment**

A principle purpose of the summary judgment procedure is to isolate and dispose of factually unsupported claims. See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). A party moving for summary judgment that does not have the ultimate burden of persuasion at trial (usually the defendant) has the initial burden of producing evidence negating an essential element of the non-moving party's claims *or* showing that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. See Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party does not satisfy its initial burden, the non-moving party has no obligation to produce anything and summary judgment must be denied. If, on the other hand, the moving party has satisfied its initial burden of production, then the non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. See Nissan Fire & Marine Ins. Co., 210 F.3d at 1102. A genuine issue of fact is one that could reasonably be resolved in favor of either party. A dispute is "material" only if it could affect the outcome of the suit under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

//

//

B.   **Qualified immunity**

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The rule of qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law;" defendants can have a reasonable, but mistaken, belief about the facts or about what the law requires in any given situation. Saucier v. Katz, 533 U.S. 194, 202 (2001) (internal quotation marks and citation omitted). A ruling on the issue of qualified immunity should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive. See id. at 200.

A court considering a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right, then proceed to determine if the right was "clearly established." See Conn v. Gabbert, 526 U.S. 286, 290 (1999). The threshold question must be: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? See Saucier, 533 U.S. at 201. If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. See id. On the other hand, if a violation could be made out on the allegations, the next sequential step is to ask whether the right was clearly established. See id. The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. Id. If the law is determined to be clearly established, the next question is whether, under that law, a reasonable official could have believed his conduct was lawful. See Act Up!/Portland v. Bagley, 988 F.2d 868, 871-72 (9th Cir. 1993).

//
//
//

5

**DISCUSSION**

**A.    Probable cause**

Defendants' detention of Officer Morgan did not violate his Fourth and Fourteenth Amendment rights if defendants had probable cause to believe plaintiff was committing a crime, here, a night-time robbery. See United States v. Watson, 423 U.S. 411, 417-24 (1976). "The test for whether probable cause exists is whether 'at the moment of arrest the facts and circumstances within the knowledge of the arresting officers and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing the [plaintiff] had committed or was committing an offense.'" United States v. Jensen, 425 F.3d 698, 704 (9th Cir. 2005) (internal citation omitted). "A determination whether probable cause exists requires a 'practical, common-sense' decision based on the totality of the circumstances, including the veracity, basis of knowledge and reliability of the information provided by informants." Id.

Defendants had probable cause to believe plaintiff was committing a robbery. They were told that "two subjects came into the store, spoke to the employees, the employees then told all the customers they needed to leave that they had an emergency, and locked the doors behind them." That description itself gave the officers cause to believe a robbery was occurring.

After the dispatcher spoke to the store employee, the officers learned that the "subjects" had badges and "state papers," but were not wearing uniforms. The officers also observed that there were not any police cars parked near the store. A store employee then told the defendant officers that the two men had badges, were not uniformed, and were taking money out of the register, but the employee did not explain *why* the men were taking money. The other employee, Bill, came out as well and said the same thing. Again, he did not explain *why* the men were taking the money.

If the two men did not have badges or other government identification there is no question that the officers would have had probable cause to believe they were robbing the store. The question, then, is whether the officers' assertion that they were CHP officers and

the employees' report that the men had badges and "state papers" sufficiently undermined probable cause. Because the CHP officers were not uniformed, did not have a marked police car, and had not notified the Pleasant Hill Police Station in advance that they were serving the tax warrant, the officers had probable cause to believe a robbery was being committed by two men claiming to be police. Plaintiff does not cite any case that suggests that an officer has to accept that anyone who has an official looking badge is in fact an officer on official police business.

At a minimum, the officer defendants are entitled to qualified immunity. Under the facts as alleged by plaintiff, a reasonable officer in defendants' position could have believed he had probable cause.

**B.     Excessive force**

Plaintiff also claims that the force defendants used, namely, storming the store with guns targeted at plaintiff and his partner, making them get to the ground, handcuffing them, searching them (twice), and the length of the detention (10 minutes) was constitutionally excessive and that the defendants are not entitled to qualified immunity.

Under Saucier v. Katz, 533 U.S. 194 (2000), the first prong of the qualified-immunity inquiry is "whether a constitutional right would have been violated on the facts alleged." 533 U.S. at 200. "[I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." Id. at 201.

This two-step inquiry is intended to respect the subtle but important difference between the reasonableness inquiry that is central to excessive-force claims and the role that reasonableness plays in the qualified-immunity analysis. See Robinson v. Solano County, 278 F.3d 1007, 1012 (9th Cir. 2002) (en banc). As the Supreme Court explained in Saucier, whether an officer used excessive force turns on "the reasonableness of the officer's belief as to the appropriate level of force." Id. at 205. Even when the officer's belief in this regard is mistaken, however, the officer may still be entitled to qualified immunity if his mistake was a reasonable one. Id. Accordingly, the Supreme Court rejected the Ninth Circuit's attempt to

collapse the excessive-force and qualified-immunity determinations into a single reasonableness inquiry for consideration by a jury; instead, the Supreme Court held that the issue of qualified immunity must remain a legal determination for the court, where that determination turns on "what the officer reasonably understood his powers and responsibilities to be, when he acted, under clearly established [legal] standards." Id. at 208.

### 1. First step: could a jury find excessive force?

"In considering the first step of Saucier's two-step qualified immunity inquiry, [a court] must determine whether [the plaintiff's] constitutional right to be free from excessive force was violated." Jackson v. City of Bremerton, 268 F.3d 646, 651 (9th Cir. 2001). This prong is satisfied when, viewing the evidence in the light most favorable to the party asserting the injury, a reasonable juror could conclude that the officer's conduct constituted excessive force. See Headwaters Forest Defense v. County of Humboldt, 276 F.3d 1125, 1129-30 (9th Cir. 2002).

The question of whether police officers used excessive force "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Robinson, 278 F.3d at 1013-14 (internal quotation marks and citation omitted). The "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation." Graham v. Connor, 490 U.S. 386, 396-97 (1989).

No reasonable jury could find that the officers' actions here were excessive. First, the crime the officers believed was being committed–a night time robbery–is a serious felony. Second, the "suspects" posed an immediate threat to the officers because the officers believed they were engaging in a night time robbery–common sense (and defendants' expert) suggest that persons who commit such crimes are dangerous and may in fact have a weapon even if they have not brandished it thus far. It would be unreasonable to expect police

8

officers to enter a store they believe is being robbed without having their guns out, and then handcuffing and searching the suspects. It is thus unsurprising that plaintiff does not cite any case which suggests that the officers' conduct in these circumstances was unreasonable.

Plaintiff's reliance on Robinson is unpersuasive. In that case the plaintiff shot two dogs that had killed his livestock. A police dispatcher told the defendant officers that "a man carrying a shot gun who had just shot two dogs is 'in the middle of the street yelling at this time.'" 278 F.3d at 1010. When the police arrived, Robinson was in his home wearing an unbuttoned shirt and jeans. He walked from his home toward the police, and the police were able to see that he was calm. While he approached the police, the officers kept their guns holstered. Id. Robinson then told the police his name and that he was involved with the dogs. The defendant officers responded by pointing their guns at Robinson's head. Id.

The Ninth Circuit held that the pointing of the guns could be considered excessive force. It noted that none of the factors justifying the use of force, including the seriousness of the crime and danger to the officers, was present. The crime police were investigating was at most a misdemeanor and the plaintiff appeared unarmed and was approaching the officers in a peaceful way. Id. at 1014. The court also noted that the police never even searched the plaintiff for a weapon. Finally, it concluded that the plaintiff's "use of a weapon, that he clearly no longer carried, is insufficient to justify the intrusion on Robinson's personal security." Id. at 1014.

Here, in stark contrast, the defendant officers believed the plaintiff was in the midst of committing a serious felony–a night-time robbery. While no one had told the officers that plaintiff was armed, a reasonable officer would believe that one committing a night-time robbery by pretending to be a police officer could very well be armed. As soon as the officers secured plaintiff they searched him, and then searched him again, corroborating the officers' assertion that they believed plaintiff might be armed. Under these circumstances, no reasonable jury could find the officers' conduct was unreasonable.

//

//

9

### 2. Second step: was the right clearly established

Even assuming, however, that a jury could find excessive force, qualified immunity applies if the right to be free of having guns pointed at you and being handcuffed under these circumstances was not clearly established. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 202. Qualified immunity protects defendants' conduct unless there was "a clearly established rule prohibiting [him] from acting as he did." Id. at 209.

As the above discussion demonstrates, the law was not clearly established that the defendants' conduct here was unconstitutional. Plaintiff does not cite a single case that suggests officers cannot handcuff, search, and draw guns when they reasonably believe a suspect is committing a night-time robbery. Defendants are entitled to summary judgment on plaintiffs' excessive force claim.

### C. Racial profiling

Plaintiff also makes an Equal Protection claim. The Equal Protection clause prohibits selective enforcement of law based on a person's race. See Whren v. United States, 517 U.S. 806, 813 (1996). The Sixth Circuit has held that Whren confirmed that "an officer's discriminatory motivations for pursuing a course of action can give rise to an Equal Protection claim, even where there are sufficient objective indicia of suspicion to justify the officer's actions under the Fourth Amendment." Farm Labor Organizing Comm. v. Ohio, 308 F.3d 523, 533 (6th Cir. 2002). Plaintiff relies on Officer Dexheimer's statement–"this is Pleasant Hill, this town is lily white . . . you guys are two minorities . . . what do you expect us to do?" –as evidence sufficient to support a finding that plaintiff's race was a motivating factor in how the officers responded to the call.

Defendants do not dispute the above legal standard; instead, they claim the remark was off-hand and that Officer Dexheimer merely meant that "the City of Pleasant Hill is a very low crime area and he used the term 'lily white' in the literary fashion to mean

'innocent.'"  Defendants also claim that because they immediately apologized to plaintiff and his partner that is "proof positive about their lack of any racial intent."

Defendants' argument is just that: argument.  Officer Dexheimer's statement gives rise to an inference that the reason the officers responded as they did is because of plaintiff's race.  The Court cannot grant summary judgment on this claim.

### D.    **Monell** claim

A city can be sued directly for monetary, declaratory, or injunctive relief under section 1983 where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  Monell v. Dept. of Social Services of City of New York, 436 U. S. 658, 690 (1978).  To establish such municipal liability, a plaintiff must satisfy four conditions: "(1) that [the plaintiff] possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy 'amounts to deliberate indifference' to the plaintiff's constitutional right; and (4) that the policy is the 'moving force behind the constitutional violation.'"  Van Ort v. Estate of Stanewich, 92 F.3d 831, 835 (9th Cir. 1996) (quoting Oviatt v. Pearce, 954 F.2d 1470, 1474 (9th Cir.1992) (citation omitted)).  A municipality, however, cannot be held liable strictly on a respondeat superior theory.  See Kreutzer v. County of San Diego, 153 Cal.App.3d 62, 70 (1984).

As there was no probable cause or excessive force violation, plaintiff's Monell claim is necessarily limited to plaintiff's Equal Protection claim.  The question, then, is whether plaintiff has come forward with evidence sufficient to support a finding that defendants' alleged Equal Protection violation was caused by, at least in some respects, a Pleasant Hill policy that amounts to deliberate indifference to plaintiff's constitutional rights.

Plaintiff has not come forward with sufficient evidence.  The evidence is undisputed that in May 2003 both individual defendants received five hours of training in a course entitled "racial profiling."  The course was certified by the State of California Commission on Peace Officer Standards and Training**.**  In light of such undisputed evidence no reasonable trier of fact could find that the City of Pleasant Hill had a police policy that was

11

1  deliberately indifferent to the equal protection rights of minorities and led to the alleged
2  violation here.
3      Plaintiff responds that at the time of the incident the Pleasant Hill Police Department
4  did not have a *written* racial profiling policy, and he complains that the training was done
5  several years after it was required by law.  Neither of these facts supports an inference that at
6  the time of the incident the City was deliberately indifferent to racial profiling.  The very
7  officer who made the racial statement received five hours of racial profile training several
8  months before the incident.
9       Plaintiff also contends that the training was inadequate because at his deposition
10 defendant Sanchez did not recall having attended the training.  After Officer Sanchez's
11 memory was refreshed, however, he did recall the training.  He also testified that one of the
12 principles taught in the class was that "race should not influence your police work."
13     In sum, no reasonable trier of fact could find a municipal policy that was the "moving
14 force" behind defendants' alleged Equal Protection violation.

E.   **State law claims**

16     Plaintiff also makes claims pursuant to California Civil Code sections 51.7 and 52.1.
17 Defendants allege that these claims "relate to the racial profiling" issue.  As there is a
18 genuine dispute as to whether the officers' responded differently because of plaintiff's race,
19 summary judgment on this claim must be denied.

### CONCLUSION

21     For the foregoing reasons, defendants' motion for summary judgment on plaintiff's
22 probable cause, excessive force, and <u>Monell</u> claims is GRANTED.  In all other respects the
23 motion is DENIED.

     **IT IS SO ORDERED.**

Dated: December 16, 2005                    CHARLES R. BREYER
                                            UNITED STATES DISTRICT JUDGE

G:\CRBALL\2004\4865\orderresj.wpd           12